UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

PRESTON SCOTT PLAUGHER,

Petitioner,

v.

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,

Respondent.

No. 1:17-cv-00734-GSA

**ORDER REMANDING CASE FOR FURTHER PROCEEDINGS UNDER SENTENCE 4 OF 42 U.S.C. § 506(g)**

I.     <u>**Introduction**</u>

Plaintiff Preston Scott Plaugher ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for disability insurance benefits pursuant to Title II of the Social Security Act.  The matter is currently before the Court on the parties' briefs which were submitted without oral argument to the Honorable Gary S. Austin, United States Magistrate Judge.[1]  *See* Docs. 15, 16 and 19.  Having fully reviewed the administrative record the Court finds that the ALJ erred in determining Plaintiff's physical residual functional capacity.  Accordingly, the above-captioned case is remanded for further proceedings consistent with this opinion.

///

///

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge.  *See* Docs. 8 and 10.

1

## II.    Procedural Background

In 2007, Plaintiff applied for disability benefits due to depression and severe neck pain. AR 72.  After the application was denied on reconsideration in April 2008, Plaintiff did not pursue the claim further.  AR 72.

On October 30, 2013, Plaintiff filed an application for disability insurance benefits under Title II of the Social Security Act, alleging disability beginning January 1, 2012.  AR 15.  The Commissioner denied the applications initially on February 12, 2014, and upon reconsideration on June 3, 2014.  AR 17.  On July 25, 2014, Plaintiff filed a timely request for a hearing before an Administrative Law Judge.  AR 17.

Administrative Law Judge Timothy S. Snelling presided over an administrative hearing on November 25, 2015.  AR 35-63.  Plaintiff, represented by counsel, appeared and testified.  AR 38.

On December 30, 2015, the ALJ denied Plaintiff's application.  AR 15-29.  The Appeals Council denied review on March 20, 2017.  AR 1-3.  On May 24, 2017, Plaintiff filed a complaint in this Court.  Doc. 1.

## III.    Factual Background

### A.    Plaintiff's Testimony and Report

#### 1.    Hearing Testimony

Plaintiff (born September 22, 1966) did not graduate from high school but received vocational training in access control and electronics which enabled him to work in various positions related to automatic gates, including manufacturing, installation, and sales. AR 39-42. His work, even as a salesman, sometimes required his lifting very heavy components.  AR 42-43, 46.

In October 2012, Plaintiff found himself emotionally unable to continue his job and spent three days in his back yard unable to enter his home.  AR 47.  Later in his testimony, Plaintiff stated that he had little memory of the time just before October 2012, emphasizing his inability to handle the stress of his employment.  AR 59-60.  Plaintiff was hospitalized for two weeks in January 2013, and for an additional week in June 2013.  AR 61.

///

At the time of his emotional crisis, Plaintiff was drinking heavily. AR 49. Employed by a small family business, he drank with his employer after work. AR 60. Plaintiff denied that alcohol use was related to his January 2013 seizure in a hospital parking lot. AR 49, 59

Plaintiff recounted a history of panic attacks and panic disorder with agoraphobia. AR 52. Although he had worked as a salesperson, he did not like to be around people. AR 52. He described his depression as a continuing, rather than episodic, problem and described his general mood as angry. AR 53.

Plaintiff could sit from five minutes to one-half hour. AR 54. He needed to change position about every fifteen minutes. AR 54. The heaviest object he lifted was a bag of dog food weighing about twenty pounds. AR 55. Plaintiff had difficulty concentrating. AR 55. He was able to drive but had not attempted to drive a long distance. AR 58.

### 2. Adult Function Reports

In December 2013, Plaintiff reported inability to concentrate, panic attacks, depression, claustrophobia, and pain from his pancreatitis and neck. AR 221. He was able to prepare his own breakfast and lunch. AR 223. He could sweep and vacuum with difficulty and cleaned up the dog waste in the yard, but could no longer do home repairs. AR 223. He sometimes picked up a few groceries but otherwise left large grocery shopping to others.[2] AR 224. When he was reluctant to go out, he asked his wife to accompany him. AR 224.

Plaintiff's impairments affected lifting, squatting, bending, standing, reaching, kneeling, climbing stairs, remembering, completing tasks, concentrating, understanding, following instructions and using his shaky hands. AR 226. He had difficulty paying attention and remembering spoken instructions. AR 226. He got along well with authority figures. AR 227.

In a second adult function report prepared in May 2014, Plaintiff reported inability to take showers, forgetting things, losing things, feeling uncomfortable driving, sleeping too much and not sleeping, hearing voices, struggling with hygiene, and failing to meet responsibilities. AR

---

[2] Plaintiff's household included his wife and two adult daughters. The record does not always indicate whether the allocation of household chores to Plaintiff reflected Plaintiff's impairments or the availability of multiple family members to share the work. For example, Plaintiff testified that he generally did not cook the evening meal because one of his daughters usually cooked it. AR 223.

258. He had trouble staying inside the house. AR 258. Pain and chronic fatigue hampered his ability to help around the house. AR 260. He could follow simple instructions. AR 263.

### 3. <u>Third Party Adult Function Report</u>

Plaintiff's wife described Plaintiff as always in pain, with severe anxiety, weight loss, and shaking hands. AR 211. He had difficulty concentrating and remembering and no longer fixed things around the house or enjoyed going out with his family. AR 211. He was able to cook prepared foods using a microwave, make the bed and empty the dishwasher. AR 213. He could vacuum with difficulty. AR 213. Plaintiff was afraid to handle household finances, and Mrs. Plaugher had performed that task for many years. AR 214. Plaintiff enjoyed watching television, playing with the family's pets, reading the Bible, and occasionally visiting family and friends. AR 215-16.

In Mrs. Plaugher's opinion, Plaintiff's impairments affected his abilities to lift, squat, bend, kneel, climb stairs, remember, complete tasks, concentrate, understand, follow instructions and use his hands. AR 216. He had no trouble walking. AR 216. He was unable to handle stress and changes in routine but got along well with authority figures and other people. AR 217.

### B. <u>Medical Treatment</u>

### 1. <u>Pain Management</u>

The record includes notes from Plaintiff's treatment with Patrick Rhoades, M.D., and his staff at Central Valley Pain Management on the following days: December 13, 2011; February 23, March 15, April 13, May 10, July 2, September 13, October 12, November 29, and December 5, 2012; and January 24, March 1, April 11, June 6, August 26, September 4, October 24 and December 13, 2013. AR 497-544. Plaintiff's complaints included headaches, neck and low back pain, and myalgias. Plaintiff's diagnoses included lumbago, low back pain; cervical pain/cervicalgia; lumbar and thoracic radiculitis; and myofascial pain syndrome, myalgia. Prescription medications included Methadone, Percocet and Methylphenidate. Treatment notes indicated that with medication Plaintiff was able to work, perform some house and yard work, walk, perform self-care and drive.

///

4

At various appointments, Plaintiff complained of numbness in the center and ring fingers of his left hand, fatigue and spasms, pain in both legs, aching and constant neck pain, lower back pain and numbness extending into his left thigh, a recent panic attack, and sciatica which Plaintiff described as sharp pain and a burning sensation. AR 529, 531, 541, 545, 551. On November 29, 2012, Plaintiff reported that he had fainted at work and lost his driver's license. AR 509. On January 29, 2013, Plaintiff told Kristy Lindstrom, P.A., that:

> He was depressed last month and didn't eat for four days which caused his electrolytes to be low. He was admitted to the hospital for seizures from his body being in that state. So now he can't drive for a year. He has had no more seizures.

> AR 537.

## 2. Sutter Health Records

On December 14, 2011, Plaintiff began treatment with his primary care physician, Mohluddin Waseem, M.D., Sutter Gould Medical Foundation. AR 566. Dr. Waseem noted a history of cervicalgia (neck pain) and carbuncles (boils) on Plaintiff's forearms. AR 566.

On August 27, 2012, Plaintiff sought treatment for "extreme anxiety" and sleep disturbances that resulted after he "bumped his car in the driveway while trying to save his dog." AR 414. Dr. Waseem prescribed Paxil and Xanax. AR 415.

When Plaintiff saw Dr. Waseem on November 1, 2012, Plaintiff reported a syncopal episode at work two weeks earlier.[3] AR 423. Plaintiff denied loss of bladder or bowel control, tongue-biting or associated bodily injuries. AR 423. On November 19, 2012, neurologist James M. Smith, M.D., performed an electro-encephalogram. AR 433. The results were normal in awake, drowsy and sleepy states and showed no evidence of epileptogenic or other seizure patterns. AR 433.

After Plaintiff fainted at work in October, the incident had been reported to DMV, which suspended Plaintiff's driver's license.[4] AR 437. On December 20, 2012, Plaintiff saw Dr. Waseem for a routine check-up and completion of DMV paperwork to regain his license. AR

---

[3] Syncope is "a temporary suspension of consciousness due to generalized cerebral ischemia; a faint or swoon." Dorland's Illustrated Medical Dictionary at 1622 (28th ed. 1994). However, the language used in the medical record suggests that Plaintiff may actually have suffered a seizure. *See, e.g.,* AR 347, 423, 433.
[4] Plaintiff's job required him to drive to see customers.

5

437.  Because the results of Plaintiff's Holter monitor and EEG were satisfactory, Dr. Waseem signed the DMV paperwork.  AR 440.  The doctor also prescribed metoprolol to address Plaintiff's high blood pressure.  AR 438.

On the evening of January 9, 2013, Plaintiff, who had recently been drinking "quite a bit," went to the emergency department of Doctors Medical Center in Modesto while experiencing alcohol withdrawal.  AR 332.  Hospital records indicated that Plaintiff had last consumed alcohol either that morning or the day before.  AR 332, 347.  While waiting to see hospital staff, Plaintiff went out into the parking lot where he had a seizure,[5] losing bladder control and incurring various skin abrasions, an irregular tongue laceration and a 5 cm. scalp contusion.  AR 332, 334, 336, 347-48.  Plaintiff, who was agitated and "somewhat combative," was placed in restraints.  AR 348.  Physicians observed delirium tremens, and blood tests revealed alcoholic ketoacidosis and other abnormalities.  AR 349-50.  A CT of Plaintiff's head revealed no acute intracranial abnormality.  AR 334, 336.  A CT scan of Plaintiff's neck showed no acute cervical spine fracture or subluxation.  AR 337.

Dr. Waseem saw Plaintiff on February 6, 2013, to follow up on Plaintiff's recent seizure and hospitalization.  AR 445.  Plaintiff was taking Librium while detoxing from alcohol.  AR 445.

At the June 6, 2013, appointment, Plaintiff reported that he was taking his medication but was not monitoring his blood pressure at home.  AR 454.

On June 11, 2013, Plaintiff was admitted to Memorial Medical Center, Modesto, after he went to an urgent care center with chest and abdominal pain.  AR 356-405.  Following a CT scan of Plaintiff's abdomen and pelvis, doctors noted:

> Moderately severe fatty infiltration of the liver.  Very minimal contour nodality of the liver raises question of early cirrhosis.  The spleen is enlarged.
>
> Acute-appearing inflammatory fat induration surrounding the pancreas and slips of predominantly retroperitoneal free fluid are compatible with pancreatitis.  Ethanol ingestion as a cause is considered given the hepatic steatosis and old fracture deformities of the right posterior 10th and [11[th]] ribs.

---

[5] Hospital records indicate that Plaintiff had prior seizures, but "not a lot."  AR 347.

AR 366-67.

Plaintiff initially told doctors that he had not had alcohol in the past year. AR 369. He later told doctors that he had a history of heavy drinking and was currently consuming two or three hard liquor drinks per day. AR 373. Following an esophagogastroduodenoscopy with endoscopic ultrasound performed on June 15, 2013, gastroenterologist Kanwar Gill, M.D., opined that Plaintiff likely had alcoholic pancreatitis. AR 377, 379. Dr. Gill advised Plaintiff to stop drinking alcohol. AR 379. When Plaintiff was discharged on June 17, 2013, his primary diagnoses were (1) acute pancreatitis (question etiology); (2) chronic pain; (3) alcohol; and (4) elevated lipase levels. AR 357. Secondary diagnoses were (1) chronic pain; (2) depression; (3) anxiety; and (4) alcohol abuse. AR 357. On July 31, 2013, Plaintiff saw Dr. Gill for follow up. AR 760.

On October 8, 2013, Plaintiff told Dr. Waseem that he was occasionally monitoring his blood pressure at home with readings averaging less than 140/90. AR 463. Blood tests indicated elevated glucose levels in the diabetic range and low testosterone. AR 463. Dr. Waseem ordered repeat tests to verify the results. AR 463. On October 15, 2013, Plaintiff requested a note confirming that he was not experiencing seizures and could return to work. AR 474. Dr. Waseem told Plaintiff to quit using alcohol and indicated that he would complete the forms if Plaintiff's alcohol test showed a negative level. AR 476.

On January 27, 2014, Plaintiff saw internist Henry A. Saalwaechter, M.D., for treatment of bronchitis. AR 575. Plaintiff complained that he was very depressed. AR 578.

When Plaintiff saw Dr. Waseem on March 28, 2014, he requested a new referral to Dr. Rhoades since his new insurance would not renew Plaintiff's methadone prescription. AR 583.

On April 4, 2014, Plaintiff saw Drs. Waseem and Gill for follow up of Plaintiff's abdominal pain. AR 595, 599. Plaintiff complained of continued gastric discomfort, including nausea and heartburn. AR 596. He had stopped taking his prescribed medication for gastric reflux disease. AR 596. Plaintiff, who had progressive weight loss, complained of low appetite. AR 596. He was eating only one meal a day. AR 596. Plaintiff denied drinking any significant amount of alcohol. AR 598. Dr. Gill opined that Plaintiff likely had chronic autoimmune

pancreatitis and prescribed pancreatic enzyme supplements.  AR 598.

Four lumbar spine x-rays taken May 16, 2014, revealed interval moderate anterior compression at the T12 level.  AR 773.  Radiologist Roy Snable, M.D., diagnosed a compression fracture.  AR 773.  Evaluating four cervical spine x-rays taken on the same day, Dr. Snable identified minimal disc space narrowing at C4-C5 and C5-C6, right neural foraminal narrowing at C3-C4, and left neural foraminal narrowing at C5-C6.  AR 773.

On May 21, 2014, Plaintiff, for the first time, saw Alan P. Jakubowski, M.D., a pain management specialist at Sutter Health. AR 608.  The doctor noted that Plaintiff's chronic low back and neck pain dated to 2002, when he was injured while working as a floor installer.  AR 608.  At that time, Plaintiff received worker's compensation treatment through Kaiser.  AR 608.  For the past eight years, Plaintiff had received medication (Methadone and Percocet) but never had physical therapy.  AR 608, 612.   Dr. Jakubowski ordered magnetic resonance imaging and prescribed a nonsteroidal anti-inflammatory drug.  AR 612.

On June 7, 2014, Jared Heimbigner, M.D., evaluated magnetic resonance images of Plaintiff's lumbar and cervical spine.  AR 561-64.  After reviewing the images of Plaintiff's lumbar spine, Dr. Heimbigner identified multilevel lumbar spondylosis with areas of foraminal narrowing, most significant at L4-5, and anterior wedging of the T12 vertebral body, which could be physiologic versus sequelae of an old compression fracture.  AR 562.  He also identified a partly imaged apparent edema within the left posterior twelfth rib, which possibly represented a rib fracture.  AR 562.  Dr. Heimbigner recommended that Dr. Jakubowski correlate the apparent rib anomaly with Plaintiff's conventional x-rays and medical history.  AR 562.

Evaluating the cervical images, Dr. Heimbigner identified broad-based posterior disc protrusion at C5-6, which contacted the ventral spinal cord.  AR 563.  He also noted uncovertebral degenerative changes at C5-6, with mild right and a suggestion of moderate left foraminal narrowing.  AR 563.

At a follow-up appointment on August 8, 2014, Dr. Jakubowski referred Plaintiff for a cervical epidural injection at C5-6, and for a neurosurgical consultation due to the effacement of the cervical spinal cord.  AR 639.  He continued prescriptions for methadone and Norco.  AR

639.

On August 13, 2014, Plaintiff saw Dr. Gill for a follow-up appointment to review his test results. AR 650. On August 26, 2014, he had a follow up appointment with Dr. Waseem. AR 665. When Plaintiff saw Dr. Jakubowski on October 15, 2014, he had not yet received a cervical epidural injection or a neurosurgical evaluation. AR 677. The first injection was administered on October 17, 2014. AR 775.

On November 12, 2014, Plaintiff saw Dr. Gill to follow up on abnormal liver test results. AR 689. Plaintiff denied any significant alcohol use. AR 692. Plaintiff's abdominal discomfort was stable, and the pancreatic enzymes were helping reduce his abdominal pain. AR 692-93.

Plaintiff saw Dr. Jakubowski again on December 30, 2014. AR 716. The cervical epidural injection in October had been effective, but Plaintiff's pain had recurred higher on his back. AR 716. Dr. Jakubowski ordered a second injection. AR 716. Thereafter, Plaintiff saw Dr. Jakubowski on February 9 and March 13, 2015. AR 730.

### IV.    Standard of Review

Pursuant to 42 U.S.C. §405(g), this court has the authority to review a decision by the Commissioner denying a claimant disability benefits. "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted). Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a scintilla, but less than a preponderance. *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (internal citation omitted). When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Social Security Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citations and internal quotation marks omitted).

If the evidence reasonably could support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112

F.3d 1064, 1066 (9th Cir. 1997) (citation omitted). "[T]he court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citations and internal quotation marks omitted).

## V. **The Disability Standard**

> To qualify for benefits under the Social Security Act, a plaintiff must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if . . . his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

> 42 U.S.C. §1382c(a)(3)(B).

To achieve uniformity in the decision-making process, the Commissioner has established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 416.920(a)-(f). The ALJ proceeds through the steps and stops upon reaching a dispositive finding that the claimant is or is not disabled. 20 C.F.R. §§ 416.927, 416.929.

Specifically, the ALJ is required to determine: (1) whether a claimant engaged in substantial gainful activity during the period of alleged disability, (2) whether the claimant had medically determinable "severe impairments," (3) whether these impairments meet or are medically equivalent to one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1, (4) whether the claimant retained the residual functional capacity ("RFC") to perform his past relevant work, and (5) whether the claimant had the ability to perform other jobs existing in significant numbers at the national and regional level. 20 C.F.R. § 416.920(a)-(f).

## VI. **Summary of the ALJ's Decision**

Using the Social Security Administration's five-step sequential evaluation process, the ALJ determined that Plaintiff did not meet the disability standard. AR 15-29. The ALJ found that Plaintiff had engaged in substantial gainful activity from January 1, 2012 through October

10

17, 2012.  AR 17.  His severe impairments included degenerative disc disease of the lumbar spine, depression versus major depressive disorder, pancreatitis, panic attacks versus panic disorder with agoraphobia, a history of alcohol abuse, withdrawal seizure versus seizure disorder, a chronic pain syndrome, delirium tremens, hypertension, myofascial pain syndrome, myalgias, sacroiliac joint dysfunction, neuralgia and neuritis, not otherwise specified, and anorexia.  AR 18.  None of the severe impairments met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d); 404.1525; 404.1526).  AR 18.

The ALJ concluded that Plaintiff had the residual functional capacity to perform a wide range of light work as defined in 20 C.F.R. §§ 404.1567(b), except that Plaintiff was limited to occasional postural activities like climbing ladders, ropes, scaffolding, ramps and stairs, and stooping, crouching, crawling, and kneeling.  AR 20.  Plaintiff needed to avoid concentrated exposure to hazards such as dangerous and unprotected moving machinery, heights, bodies of water, temperature extremes, vibration and dampness.  AR 20.  He should have no more than occasional face-to-face interaction with the public, coworkers and supervisors.  AR 20-21.  He was no more than occasionally able to understand, remember and carry out complex and detailed job instructions or make judgments on complex work-related assignments.  AR 21.

Claimant could perform jobs existing in significant numbers in the national economy.  AR 27.  Accordingly, the ALJ found that Plaintiff was not disabled from January 1, 2012, through December 30, 2015, the date of the hearing decision.  AR 28-29.

**VII.**     **<u>Plaintiff's Credibility</u>**

Plaintiff contends that the ALJ failed to articulate clear and convincing reasons for rejecting Plaintiff's testimony.  Doc. 15 at 24-27.  Plaintiff alleges as error: (1) the ALJ's assessment of Plaintiff's daily activities; (2) the ALJ's observation regarding the absence of opinions of treating physicians; (3) Plaintiff's willingness to return to work; and (4) the lack of supporting evidence in Plaintiff's medical records to support the ALJ's findings.   Emphasizing that a claimant's testimony does not constitute conclusive evidence of disability, Defendant disagrees.  Doc. 16 at 9-12.  After reviewing the record as a whole and applicable law, the Court finds that sufficient evidence supports the ALJ's conclusion that Plaintiff lacked credibility.

///

## A.      **Applicable Legal Standard**

An ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). His findings of fact must be supported by specific, cogent reasons. *Rashad v. Sullivan*, 903 F.2d 1229, 1231 (9th Cir. 1990). To determine whether the ALJ's findings are supported by substantial evidence, a court must consider the record as a whole, weighing both the evidence that supports the ALJ's determination and the evidence against it. *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989).

A claimant's statement of pain or other symptoms is not conclusive evidence of a physical or mental impairment or disability. 42 U.S.C. § 423(d)(5)(A); Soc. Sec. Rul. 16-3p, 2017 WL 5180304 (Oct. 25, 2017). "An ALJ cannot be required to believe every allegation of [disability], or else disability benefits would be available for the asking, a result plainly contrary to the [Social Security Act]." *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).

An ALJ performs a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible. *See Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014); *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996). First, the claimant must produce objective medical evidence of an impairment that could reasonably be expected to produce some degree of the symptom or pain alleged. *Garrison*, 759 F.3d at 1014; *Smolen*, 80 F.3d at 1281-1282. In this case, the first step is satisfied by the ALJ's finding that Plaintiff's "medically determinable impairments could reasonably be expected to produce the alleged symptoms." AR 24. The ALJ did not find Plaintiff to be malingering.

If the claimant satisfies the first step and there is no evidence of malingering, the ALJ may reject the claimant's testimony regarding the severity of his symptoms only if he makes specific findings that include clear and convincing reasons for doing so. *Garrison*, 759 F.3d at 1014-15; *Smolen*, 80 F.3d at 1281. "[T]he ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester*, 81 F.3d at 834. *See also* Social

Security Ruling ("SSR") 96-7p[6] (stating that an ALJ's decision "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight"). It is not sufficient for the ALJ to make general findings; he must state which testimony is not credible and what evidence in the record leads to that conclusion. *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993); *Bunnell v. Sullivan*, 947 F.2d 341, 345-46 (9th Cir. 1991).

In assessing the claimant's credibility, the ALJ may use "ordinary techniques of credibility evaluation," considering factors such a lack of cooperation during consultative examinations, a tendency to exaggerate, inconsistent statements, an unexplained failure to seek treatment, inconsistencies between the testimony and conduct; and inconsistencies between daily activities and the alleged symptoms. *Tonapetyan v. Halter,* 242 F.3d 1144, 1147 (9th Cir. 2001); *also see Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996); *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (including as factors claimant's reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, work record, and testimony from physicians and third parties about the nature, severity, and effect of the alleged disabling

---

[6] Social Security Ruling 96-7p was superseded by Ruling 16-3p, effective March 28, 2016. See 2016 WL 1020935, *1 (March 16, 2016); 2016 WL 1131509, *1 (March 24, 2016) (correcting SSR 16-3p effective date to March 28, 2016); 2017 WL 5180304, *2 (Oct. 25, 2017) (further correcting SSR 16-3p). Although the second step has previously been termed a credibility determination, recently the Social Security Administration ("SSA") announced that it would no longer assess the "credibility" of an applicant's statements but would instead focus on determining the "intensity and persistence of [the applicant's] symptoms." See SSR 16-3p, 2016 WL 1020935 at *1 ("We are eliminating the use of the term 'credibility' from our sub-regulatory policy, as our regulations do not use this term. In doing so, we clarify that subjective symptom evaluation is not an examination of an individual's character."). Social Security Rulings reflect the SSA's official interpretation of pertinent statutes, regulations, and policies. 20 C.F.R. § 402.35(b)(1). Although they "do not carry the force of law," Social Security Rulings "are binding on all components of the Social Security Administration" and are entitled to deference if they are "consistent with the Social Security Act and regulations." 20 C.F.R. § 402.35(b)(1); *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1224 (9th Cir. 2009) (citations and quotation marks omitted).

As the Ninth Circuit recently acknowledged, SSR 16-3p "makes clear what our precedent already required: that assessments of an individual's testimony by an ALJ are designed to 'evaluate the intensity and persistence of symptoms after [the ALJ] find[s] that the individual has a medically determinable impairment(s) that could reasonably be expected to produce those symptoms,' and not to delve into wide-ranging scrutiny of the claimant's character and apparent truthfulness." *Trevizo v. Berryhill*, 871 F.3d 664, 678 n.5 (9th Cir. 2017) *see also Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016) (Posner, J.) ("The change in wording is meant to clarify that administrative law judges aren't in the business of impeaching claimants' character; obviously administrative law judges will continue to assess the credibility of pain assertions by applicants, especially as such assertions often cannot be either credited or rejected on the basis of medical evidence.") SSR 16-3p became effective after the issuance of the ALJ's decision in this case. When a federal court reviews the final decision in a claim, the district court is to apply the rules in effect when the decision was issued by the agency. SSR 16-3p, 2017 WL 5180304 at *1 (Oct. 25, 2017).

symptoms).  "If the ALJ finds that the claimant's testimony as to the severity of her pain and impairments is unreliable, the ALJ must make a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony."  *Thomas*, 278 F.3d at 958.  "[A] reviewing court should not be forced to speculate as to the grounds for an adjudicator's rejection of a claimant's allegations of disabling pain."  *Bunnell*, 947 F.2d at 346.  On the other hand, if the ALJ's credibility finding is supported by substantial evidence in the record, courts "may not engage in second-guessing."  *Thomas*, 278 F.3d at 959.

## B.    Plaintiff's Daily Activities

An ALJ may reject a claimant's symptom testimony if it is inconsistent with the claimant's daily activities.  *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005).  Although a claimant need not vegetate in a dark room to be eligible for benefits, "the ALJ may discredit a claimant's testimony when the claimant reports participation in everyday activities indicating capabilities that are transferable to a work setting."  *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012).  Even if the claimant's activities demonstrate some impaired functioning, "they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of totally debilitating impairment."  *Id.* at 1113.  *See also Rounds v. Comm'r Soc. Sec. Admin.*, 807 F.3d 996, 1006 (9th Cir. 2015) (affirming adverse credibility determination based on the claimant's ability to care for her daughter and cats, prepare simple meals, share housework with her roommate, shop for groceries and pay bills); *Morgan v. Comm'r Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999) (claimant able to do work-based activities including fixing meals, doing laundry, performing yard work and occasionally caring for a friend's child).

The cases on which Plaintiff relies (Orn, Reddick and Garrison) do not necessarily support a conclusion that the ALJ erred in partially attributing Plaintiff's lack of credibility to his daily activities.

The Ninth Circuit articulated a formula for determining when a claimant's daily activities discredit the claimant's allegation of disabling impairments in *Fair v. Bowen*, 885 F.2d 597 (9th Cir. 1989).  In the Fair case,  Fair's severe impairments included a herniated disc, sciatic pain

14

radiating into his thigh, arthritis in his back and nearly all major joints, headaches, obesity, gastric

distress, hypertension, allergies, social isolation, anxiety, claustrophobia and insomnia. *Id.* at

600. Considering the ALJ's rejection of Fair's excess pain testimony, the court wrote, "[I]f,

despite his claims of pain, a claimant is able to perform household chores and other activities that

involve many of the same physical tasks as a particular type of job, it would not be farfetched for

an ALJ to conclude that the claimant's pain does not prevent the claimant from working." *Id.* at

603. Although the court acknowledged that "the Social Security Act does not require that

claimants be utterly incapacitated to be eligible for benefits . . . "if a claimant is able to spend a

substantial part of his day engaged in pursuits involving the performance of physical functions

that *are* transferable to a work setting, a specific finding of this fact may be sufficient to discredit

an allegation of disabling excess pain." *Id.*

In a case applying the *Fair* formulation, the claimant alleged and proved chronic

respiratory problems, including asthma and severe chronic obstructive pulmonary disease that

rendered him continuously short of breath; sleep apnea and resulting severe fatigue; circulatory

problems; chronic foot ulcers; and morbid obesity. *Orn v. Astrue*, 495 F.3d 625, 628 (9th Cir.

2007). The respiratory disorders, which his physicians characterized as his primary impairment,

required regular outpatient treatment and emergency room treatment as well as hospitalization on

at least one occasion. *Id.* The claimant's condition was progressively worsening and he was

dependent on supplemental oxygen at all times. *Id.*

Orn's constant shortness of breath limited his daily activities. *Id.* He required assistance

in dressing and bathing. *Id.* He did not cook nor perform household maintenance beyond making

his bed. *Id.* Because he needed to avoid fumes, odors, dust and gases, Orn generally remained

inside his home. *Id.* He spent his days reading, watching television and coloring in coloring

books. *Id.*

In *Orn*, the Ninth Circuit rejected the ALJ's conclusion that reading, watching television

and coloring in coloring books rendered Orn's testimony not credible, and that Orn was capable

of working as a surveillance system monitor. *Id.* at 639. "[R]eading, watching television, and

coloring in coloring books are activities that are so undemanding that they cannot be said to bear

15

a meaningful relationship to the activities of the workplace." *Id.* Specifically, these activities were not akin to the skills required to monitor surveillance systems, namely, sustained concentration and attention and the ability to act immediately in an emergency. *Id.*

In the Reddick case, Reddick had been diagnosed with chronic fatigue syndrome and frequently fell asleep at work. *Reddick v. Chater*, 157 F.3d 715, 719-20 (9th Cir. 1998). "Her activities were sporadic and punctuated with rest." *Id.* at 722. Noting that the description of Reddick's activities was consistent with chronic fatigue syndrome, which is "characterized by periods of exacerbation and remission," the Ninth Circuit held that a claimant's daily activities only bear on the claimant's credibility if they are inconsistent with her claimed limitations. *Id.*

Finally, in the Garrison case, Garrison complained of intense neck and back pain, which radiated into her shoulders, arms and legs. *Garrison*, 759 F.3d at 1015. Among other reasons, the ALJ rejected Garrison's pain testimony based on Garrison's testimony that she engaged in daily activities including talking on the phone, preparing meals, cleaning her room and helping to care for her daughter. *Id.* The Ninth Circuit found that the ALJ mischaracterized Garrison's testimony, which emphasized Garrison's reliance on her mother's assistance to perform her daily responsibilities, including caring for her daughter, and her need to rest after performing household activities, often napping several hours daily. *Id.* at 1016. The court concluded that Plaintiff's description of her activities was consistent with her pain testimony and inconsistent with the ability to function in a work place environment. *Id.*

Although Plaintiff contends that his daily activities are analogous to those of Orn, Reddick and Garrison, Plaintiff's reported daily activities are more robust and work-like than the activities described in those cases. Plaintiff does not contend that the ALJ misinterpreted his testimony.

Considering listing impairments at step three, the ALJ in this case found that Plaintiff had mild impairment of his daily activities. AR 19. Plaintiff was able to care for his children and the family's pets; independently perform personal hygiene activities other than showering, which was incompatible with Plaintiff's claustrophobia; prepare quick meals; do dishes, and some house cleaning and small home projects. AR 19. The ALJ noted that his assessment was consistent with the opinion of Dr. DeBattista, who found that although Plaintiff required some coaxing from

his wife, he was independent in his activities of daily living. AR 19. In determining Plaintiff's

residual functional capacity, the ALJ repeated his step three assessment of Plaintiff's daily

activities and concluded that Plaintiff described activities of daily living were not as limited as

might be expected considering Plaintiff complaints of debilitating impairments. AR 24.

Likening his daily activities to the limited activities described in *Orn*, Plaintiff contends

that his sporadic daily activities are not sufficient to demonstrate that Plaintiff could sustain full-

time work in a competitive environment. AR 20. The comparison is not apt. As detailed in the

factual background summary above, although Plaintiff's physical and emotional problems limited

him to less than the full range of work at all exertional levels, Plaintiff was capable of various

activities transferable to a work environment including the ability to drive, occasionally lifting up

to twenty pounds, and household activities including cooking, vacuuming, child and pet care,

shopping and social activities. In fact, Plaintiff continued to work for ten months after the

alleged the onset of disability.

The ALJ's assessment of Plaintiff's credibility was appropriately based on such clear and

specific examples of his daily activities and conformed to applicable law.

### C. Medical Record Evidence

Plaintiff also contends that the ALJ erred in concluding that the medical treatment records,

and the lack of support of treating or examining physicians for Plaintiff's alleged impairments

limited Plaintiff's credibility. Doc. 15 at 25-27. The Commissioner disagrees, noting Plaintiff's

unexplained lack of compliance with medication, treatment, testing and procedures, and the long-

term efficacy of Plaintiff's prescribed pain medication. Doc. 16 at 10-11.

The ALJ found that Plaintiff's "treatment [was] well documented; however, the record

d[id] not support his allegations of disabling symptoms despite treatment." AR 21. The ALJ then

presented a detailed summary of the medical opinions included in the administrative record,

including Plaintiff's reported symptoms and treatment, before concluding that the medical record

did not support the intensity, persistence and limiting effects that Plaintiff alleged. AR 21-24.

The ALJ wrote:

The record does not contain any opinions from treating or examining

17

physicians indicating that the claimant is disabled or even has limitations greater than those determined in this decision. Given the claimant's allegations of totally disabling symptoms, one might expect to see some indication in the treatment records of restrictions placed on the claimant by a treating doctor. Yet a review of the record in this case reveals no restrictions recommended by the treating doctor. The lack of support from a treating source further erodes the claimant's credibility.

The record indicates that the claimant sought his physician's release to return to his previous job. This request is inconsistent with the claimant's allegations of disabling impairments and as such, further erodes his credibility.

AR 25 (citations to record omitted).[7]

The law does not require an ALJ simply to ignore inconsistencies between objective medical evidence and a claimant's testimony.[8] "While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of claimant's pain and its disabling effects." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); SSR 16-3p (citing 20 C.F.R. § 404.1529(c)(2)). An ALJ properly considers whether the medical evidence supports or is consistent with a claimant's pain testimony. *Id.*; 20 C.F.R. §§ 404.1529(c)(4), 416.1529(c)(4) (symptoms are determined to diminish residual functional capacity only to the extent that the alleged functional limitations and restrictions "can reasonably be accepted as consistent with the objective medical evidence and other evidence").

---

[7] Relying on his own adult function report dated December 2, 2013 (AR 210), Plaintiff contends that even if he desired to return to work, his physicians would not permit him to do so. Plaintiff's desire to return to work is a more complex proposition than Plaintiff suggests. Following Plaintiff's syncopal episode on the job in October 2012, the DMV revoked his driver's license pending determination of the severity of Plaintiff's fainting or seizure. AR 437. On December 20, 2012, noting that Plaintiff's EEG was negative and Holter monitor results benign, Dr. Waseem executed the DMV forms for the return of Plaintiff's driver's license, but advised Plaintiff not to take his pain medication (Methadone) until after work hours. AR 438. In January 2013, Plaintiff experienced a seizure, apparently resulting from alcohol withdrawal. AR 332. Thereafter, Plaintiff experienced additional medical problems, some of which may have been attributable to alcohol abuse, but did not consistently provide his physicians with full and accurate disclosure of his alcohol use. *See, e.g.,* AR 373, 379. On October 15, 2013, Plaintiff again sought to return to work, requesting a note confirming that he was no longer experiencing seizures. AR 474. Dr. Waseem told Plaintiff that when Plaintiff complied with medical advice to discontinue alcohol use and completed a test showing a "negative" blood alcohol level, he would authorize Plaintiff's return to work. AR 476. Although the medical records are silent regarding any future resolution of this issue, Plaintiff testified at the administrative hearing that he was driving. AR 58.

[8] The ALJ inexplicably did not discuss evidence throughout the medical records of Plaintiff's misrepresenting the extent of his alcohol consumption and the nature of his symptoms and diagnoses in illnesses treated by doctors other than the doctor from which Plaintiff was then seeking treatment. *See, e.g.,* AR 369, 373, 476, 537, 692.

///

An ALJ may reject symptom testimony that is contradicted by or inconsistent with the record and, as long as other reasons are provided, lacking the support of objective medical evidence. *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1161 (9th Cir. 2008) (holding that the ALJ did not err in rejecting Carmickle's testimony that he could lift ten pounds occasionally in favor of a physician's opinion that Carmickle could lift ten pounds frequently); *Rollins*, 261 F.3d at 857; *Tonapetyan*, 242 F.3d at 1148.

Medications, treatments and other methods used to alleviate symptoms are "an important indicator of the intensity and persistence" of a claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.1529(c)(3); SSR 16-3p. An ALJ may consider unexplained or inadequately explained failure to seek or follow through with treatment, *Tommasetti*, 533 F.3d at 1039; the use of conservative treatment, *Parra v. Astrue*, 481 F.3d 742, 750-51 (9th Cir. 2007); and any other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. §§ 404.1529(c)(3)(vii), 416.1529(c)(3)(vii).

Taken as a whole, the ALJ discussion of the contrast between Plaintiff's representations of his impairments and the medical treatment records clearly and convincingly supports the ALJ;'s assessment of Plaintiff's credibility.

### D.    Conclusion

The ALJ's assessment of Plaintiff's lack of credibility was adequately supported by clear and convincing evidence in the record.

### VIII.   Residual Functional Capacity Determination

Plaintiff contends that the Court must reverse the residual functional capacity determinations at step four because: (1) the physical residual functional capacity determination was not supported by substantial evidence; and, (2) the ALJ erred in rejecting the expert medical consultant's opinion when formulating the mental residual functional capacity assessment. The ALJ disagrees, maintaining that both determinations were supported by substantial evidence. The Court agrees that the ALJ erred in determining Plaintiff's physical residual functional capacity at step four, but finds that the ALJ's determination of Plaintiff's mental residual functional capacity

19

1  was supported by substantial evidence.

2    **A.    Residual Functional Capacity, In General**

3    "Residual functional capacity is an assessment of an individual's ability to do sustained

4  work-related physical and mental activities in a work setting on a regular and continuing basis."

5  SSR 96-8p.  The residual functional capacity assessment considers only functional limitations and

6  restrictions which result from an individual's medically determinable impairment or combination

7  of impairments.  SSR 96-8p.

8    A determination of residual functional capacity is not a medical opinion, but a legal

9  decision that is expressly reserved for the Commissioner. See 20 C.F.R. §§ 404.1527(d)(2) (RFC

10  is not a medical opinion), 404.1546(c) (identifying the ALJ as responsible for determining RFC).

11  "[I]t is the responsibility of the ALJ, not the claimant's physician, to determine residual

12  functional capacity." *Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001).  In doing so the

13  ALJ must determine credibility, resolve conflicts in medical testimony and resolve evidentiary

14  ambiguities.  *Andrews*, 53 F.3d at 1039-40.

15    "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the

16  record such as medical records, lay evidence and the effects of symptoms, including pain, that are

17  reasonably attributed to a medically determinable impairment."  *Robbins*, 466 F.3d at 883.  *See*

18  *also* 20 C.F.R. § 404.1545(a)(3) (residual functional capacity determined based on all relevant

19  medical and other evidence).  "The ALJ can meet this burden by setting out a detailed and

20  thorough summary of the facts and conflicting evidence, stating his interpretation thereof, and

21  making findings." *Magallanes*, 881 F.2d at 751 (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408

22  (9th Cir. 1986).

23    **B.    Physical Residual Functional Capacity**

24    Plaintiff contends that the ALJ's assessment of Plaintiff's physical residual functional

25  capacity was not supported by substantial evidence and contends that the ALJ impermissibly

26  made independent medical findings in the absence of qualified medical opinions.  Doc. 15 at 12-

27  16.  Defendant counters that the ALJ appropriately assessed Plaintiff's medical treatment records,

28  medical opinion and testimonial evidence, to determine Plaintiff's residual functional capacity in

accordance with 20 C.F.R. § 404.1545(a)(3). Doc. 16 at 6. The Court concludes that the ALJ erred in concluding that the condition of Plaintiff's spinal impairment had worsened and in reducing Plaintiff's physical capacity to perform work from the medium to light level of externtion.

### 1.     Medical Opinions

The only expert medical opinions of Plaintiff's physical impairments are those of the state agency physicians. On January 23, 2014, agency physician C. Bullard, M.D., concluded that Plaintiff's spinal disorder resulted in exertional limitations. AR 76. Dr. Bullard opined that Plaintiff could occasionally lift fifty pounds and frequently lift twenty-five pounds, and could sit, stand or walk six hours in an eight-hour workday. AR 77. Plaintiff had no postural, manipulative, visual, communicative or environmental limitations. AR 77. On reconsideration, W. Jackson, M.D., agreed with Dr. Bullard's opinion. AR 90.

### 2.     The ALJ's Determination

The ALJ concluded that Plaintiff had the residual functional capacity to perform a wide range of light work as defined in 20 C.F.R. §404.1567(b) with occasional postural activities like climbing ladders, ropes, scaffolding, ramps and stair; stooping; crouching; crawling and kneeling. AR 20. Plaintiff needed to avoid concentrated exposure to hazards such as dangerous and unprotected machinery, heights, bodies of water, etc.; temperature extremes; vibration; and dampness. AR 20. In reaching this determination, the ALJ first reviewed the medical evidence of record and various medical opinions. AR 21-25. He gave some weight to the opinions of the state agency physicians who considered Plaintiff's physical impairments and opined that Plaintiff had the ability to perform work at the medium level of exertion. AR 25. The ALJ explained, however, that the agency physicians had not had the opportunity to review recent MRIs which demonstrated deterioration of Plaintiff's physical condition following the agency physician's review of Plaintiff's medical records. AR 25. Accordingly, the ALJ reduced Plaintiff's physical residual functional capacity to the light exertional level with the specified postural and environmental limitations. AR 25.

In support of his conclusion, the ALJ set forth a detailed analysis of the symptoms and

diagnoses set forth in Plaintiff's medical records, including the results of physical examinations, medical testing, x-ray and magnetic imaging, and the efficacy of the medications prescribed to alleviate Plaintiff's back pain.  AR 21-25.  He also considered evidence concerning Plaintiff's daily activities offered by Plaintiff and his wife.  *Id.*

### 3. <u>Factual Support Required to Support Residual Functional Capacity Determination</u>

Although the ALJ gave some weight to the opinions of the state agency physicians, Drs. Bullard and Jackson, he disregarded the doctors' opinions that Plaintiff was capable of working at the level of medium exertion and found rather, that Plaintiff was able to perform light work.  AR 25.  The ALJ reasoned that the agency physicians had rendered their opinions without having had access to Plaintiff's June 2014 magnetic resonance images, "which show[ed] a deterioration of the claimant's condition."  AR 25.  Plaintiff appears to assume the accuracy of the ALJ's conclusion that Plaintiff's spinal impairment had worsened, but contends that the ALJ could not determine a light residual functional capacity in the absence of medical evidence supporting that finding.  Doc. 15 at 18.

"The Secretary is not bound by the medical expert's opinion, even if it is uncontradicted." *Wilson v. Schweiker*, 553 F.Supp. 728, 736 (E.D. Wash. 1982) (citing *Rhodes v. Schweiker*, 660 F.2d 722, 723 (9th Cir. 1981)).   However, an ALJ may not reject or discount the opinions of treating or examining physicians without "giving a specific and legitimate reason supported by substantial evidence in the record."  *Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1233 (9th Cir. 2011); *Regenitter v. Comm'r of Soc. Sec. Admin.*, 166 F.3d 1294, 1298-99 (9th Cir. 1999).

Although decisions addressing this issue frequently speak of an ALJ's "play[ing] doctor and making [his] own independent medical findings,"[9] that characterization is not helpful in resolving whether an ALJ's conclusion is supported by substantial evidence because the cases

---

[9] *See, e.g., Banks v. Barnhart*, 434 F.Supp.2d 800, 805 (C.D. Cal. 2006).

cited by Plaintiff encompass multiple related but distinguishable administrative errors. Plaintiff

supports his contentions with general quotations from cases in all the categories. One group,

consisting of errors arising from an ALJ's erroneous assumptions, does not apply to this case

since Plaintiff does not allege that the ALJ's erroneously interpreted any facts in the record. *See,*

*e.g., Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) (ALJ erred in rejecting medical opinion

based on the ALJ's belief that claimant's attempts to operate a small business were inconsistent

with a diagnosis of major depression); *Manso-Pizarro v. Sec'y of Health and Human Servs.*, 76

F.3d 15, 17 (1st Cir. 1996) (ALJ's common sense determination of residual functional capacity

was not supported by substantial evidence where the largely illegible record revealed little

physical impairment and included no functional analysis by a treating or expert physician). In

another category, the ALJ erred in rejecting medical evidence of record in favor of his own

medical research outside the record. *See, e.g., Day v. Weinberger*, 522 F.2d 1154, 1155-56 (9th

Cir. 1975) (ALJ rejected opinions of treating physicians in favor of criteria set forth in a leading

medical textbook identified by the ALJ in his independent medical research). Plaintiff does not

contend that the ALJ in this case conducted outside medical research.

The issue here is that no physician had reviewed the June 2014 magnetic resonance

images to develop the record or offer an opinion on Plaintiff's residual functional capacity. No

physician compared the images to earlier images to evaluate whether the condition of Plaintiff's

spinal impairment had worsened. This means that the ALJ reached his conclusion concerning a

worsening of Plaintiff's condition and reduced Plaintiff's residual functional capacity from

medium to light based on his own interpretation of the images.

"[A]n ALJ may not act as his own medical expert as he is "simply not qualified to

interpret raw medical data in functional terms." *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir.

1999). As is the case here, the ALJ evaluating Nguyen's appeal formulated a residual functional

capacity based on magnetic resonance images without the benefit of any medical opinion about the functional limitations attributable to the impairments depicted in the images. *Id.* at 5. Because the ALJ was not qualified to translate Nguyen's magnetic resonance images into functional limitations, his determination of the Nguyen's residual functional capacity was not supported by substantial evidence. *Id. See also Dines v. Berryhill*, 2017 WL 4325593 at *2 (C.D. Cal. Sept. 27, 2017) (No. ED CV 16-02629-E) (ALJ erred in relying on his own lay review and interpretation of magnetic resonance images).

The analysis in Nguyen applies equally here. No physician opined concerning the functional effect(s) of the impairments depicted in the images, nor indicated that the images indicated that the condition of Plaintiff's spinal impairments had worsened over any particular time period. In the apparent absence of any prior magnetic resonance imaging and limited records of the historical condition of Plaintiff's spinal impairment, the ALJ could not have appropriately concluded that the Plaintiff's impairments had worsened.

When an ALJ finds that the record is inadequate to allow proper evaluation of the evidence, the ALJ has a duty to conduct an appropriate inquiry. *Mayes v. Massanari,* 276 F.3d 453, 459-60 (9th Cir. 2001); *Tonapetyan*, 242 F.3d at 1150. In such cases, an ALJ has several alternatives including: "subpoenaing the claimant's physicians, submitting questions to the claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow supplementation of the record." *Tonapetyan*, 242 F.3d at 1150. One district court summarized:

> Administrative law judges are not medical experts, their function is to gather and weigh evidence, not to make diagnoses. *Aubeuf v. Schweiker*, 649 F.2d 107, 113 (2d Cir. 1981); *Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975). When an administrative law judge is skeptical of medical evidence on record, the just solution is to obtain supplementary medical opinions by means of either a consultative examination of the claimant by another physician or of a review of extant medical records by a medical adviser. *Richardson*

*v. Perales*, 402 U.S. 389, 91 . . . (1971); *Perez v. Sec'y of Health, Educ. And Welfare*, 622 F.2d 1 (1st Cir. 1980).

*Cruz v. Dept. of Health and Human Servs.*, 586 F.Supp. 61, 62 (D.P.R. 1984).

The ALJ did not use any of the permissible methods to address the records' inadequacy. Instead he reached his own conclusions without the assistance of expert medical evaluation and opinion. As a result, the ALJ's determination of Plaintiff's physical residual functional capacity was not supported by substantial evidence.

### C.    Mental Residual Functional Capacity

Plaintiff contends that the ALJ erred in rejecting the opinions of the psychiatric consulting physician Dr. DeBattista. The Commissioner counters that the ALJ appropriately evaluated Dr. DeBattista's opinion in the context of the record as a whole.

### 1.    Psychiatric Opinions

### a.    Psychiatric Consultative Report

Psychiatrist Charles DeBattista, M.D., performed a consultative examination of Plaintiff on January 11, 2014. AR 556-558. Plaintiff complained of depressed mood, decreased appetite, insomnia, problems of concentration and memory, anhedonia and feelings of hopelessness. AR 557. He had lost forty pounds in recent months. AR 557. Plaintiff reported suicidal thoughts without plan, intention, or having acted on his thoughts. AR 557. His medications included methadone, Paxil, Ativan and Percocet. AR 557. Plaintiff denied any history of drug or alcohol abuse. AR 556.

Plaintiff was independent in his activities of daily living. AR 556. His wife needed to coax him to do household chores. AR 556. He was able to drive but did so infrequently. AR 556.

Dr. DeBattista administered a mini mental status exam with unremarkable results. AR 556. He diagnosed:

Axis I:      Panic Disorder with Agoraphobia.
             Major Depressive Disorder.

Axis II:     Deferred.

Axis III:     Seizure disorder and chronic pain condition.

Axis IV:     Psychosocial disorders over the past year: moderate.

Axis V:     GAF is approximately 58.

AR 558.[10]

Describing Plaintiff's prognosis as fair to good, Dr. DeBattista stated that Plaintiff's condition could be expected to improve in the next six-to-twelve months with active treatment.[11] AR 558.  He opined that Plaintiff was able to understand, remember and carry out simple one or two-step job instructions but not detailed and complex instructions.  AR 558.  Plaintiff was moderately impaired in his ability to relate and interact with coworkers and the public; maintain concentration, persistence and pace; accept instructions from supervisors; maintain regular attendance in the workplace; and, perform work activities on a consistent basis.  AR 558. Plaintiff ability to perform work activities without special or additional supervision was mildly impaired.  AR 558.

### b.     Agency Physicians

In February 2014, agency psychologist Preston Davis, Psy.D., noted that in Plaintiff's prior application for benefits, a February 2008 psychiatric review technique determined that Plaintiff's mental impairments were not severe.  AR 73.  Plaintiff's current medical records revealed anxiety, depression and untreated alcohol abuse.  AR 74.  Dr. Davis opined that the consulting examiner's opinions were unreliable because Plaintiff failed to disclose his history of alcohol abuse to Dr. DeBattista.  AR 74.  Dr. Davis concluded that Plaintiff's mental impairments

---

[10] The Global Assessment of Functioning (GAF) scale is a rating from 0 to 100 and considers psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness. *Diagnostic and Statistical Manual of Mental Disorders*, 32-35 (4th ed. American Psychiatric Association 1994).  A GAF between 51 and 60 indicates moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers).  *Id.*

[11] The administrative record includes no reports that Plaintiff received any psychological or psychiatric treatment other than prescriptions from his primary care physician.

did not severely inhibit his abilities.  AR 74.  On reconsideration in June 2014, W. Jackson M.D.,

agreed with Dr. Davis's assessment.  AR 90.

### 2. **ALJ's Opinion**

Analysis of Plaintiff's mental impairments began at step three when the ALJ considered

whether the evidence supported a finding that one or more of Plaintiff's severe impairments met

of medically equaled the severity of the impairments of Listings 12.04 (affective disorders), 12.05

(intellectual disability), 12.06 (anxiety related disorders) or 12.09 (substance addiction disorders).

AR 18-20.  The ALJ concluded that the evidence presented did not satisfy the paragraph B

criteria of Listings 12.04, 12.06 or 12.09, which require a claimant to establish mental

impairments that result in at least two of the following:  marked restriction of activities of daily

living; marked difficulties in maintaining social functioning; marked difficulties in maintaining

concentration, persistence or pace; or repeated episodes of decompensation, each of extended

duration.  AR 19.  He found Plaintiff to have mild restriction of daily living as evidenced by his

need for coaxing by his wife to do his chores; moderate inabilities to maintain concentration,

persistence and pace, as evidenced by his inability to pay attention and finish what he starts, pay

bills and otherwise manage financial matters, maintain regular attendance in the workplace, and

perform work activities on a consistent basis; and no episodes of decompensation of extended

duration.  AR 19-20.

The ALJ also found that Plaintiff failed to demonstrate that his affective disorder was

sufficiently severe to satisfy Listing 12.04(c), which required proof either of such marginal

adjustment that minimal increases in mental demands of environmental change would cause

Plaintiff to decompensate, or of one or more years' inability to function outside of a highly

supported living arrangement.  AR 20.  Similarly, the evidence did not establish that Plaintiff's

anxiety was so severe as to render him unable to function independently outside his home, as

required by Listing 12.06 (c).  AR 20.

At step four, the ALJ found that Plaintiff's primary mental symptoms included inability to

concentrate, panic attacks, depression, and claustrophobia.  AR 21.  Plaintiff was limited to no

more than occasional interaction with the general public, coworkers, and supervisors.  AR 20-21.

27

He was no more than occasionally able to understand, remember and carry out complex and detailed job instructions or make judgments on complex work-related job assignments. AR 21. Medical records indicated that Plaintiff complained of severe anxiety in August 2012; his symptoms of depression were worse in March 2014; and, his symptoms of depression had stabilized by August 2014. AR 23. His physician prescribed anti-anxiety medication. AR 21. In October 2014, Dr. DeBattista performed his consultative psychological examination. AR 24.

The ALJ again summarized Plaintiff's activities of daily living, finding them inconsistent with Plaintiff's complaints of disabling impairments. The ALJ wrote:

> Some of the physical and mental abilities required to perform these activities are the same as those necessary for obtaining and maintaining employment, and are inconsistent with the presence of an incapacitating or debilitating condition. The claimant's ability to participate in such activities undermines the credibility of his allegations of disabling functional limitations. The record does not contain any opinions from treating or examining physicians indicating that the claimant is disabled or has limitations greater than those determined in this decision.

AR 24-25.

The ALJ rejected opinions provided in Plaintiff's prior application for benefits (AR 298-326) as too remote in time. AR 25. The ALJ gave partial weight to Mrs. Plaugher's opinions, finding that they failed to account for Plaintiff's positive response to medication and inconsistent complaints, but were helpful in evaluating the severity and frequency of Plaintiff's limitations. AR 25. He gave no weight to the opinions of Drs. Davis and Funkenstein, both of whom denied that Plaintiff experienced any medically determinable mental impairment (AR 26), and gave partial weight to Dr. DeBattista's consultative opinion:

> Dr. DeBattista opined that the claimant is unable to perform detailed and complex tasks. The undersigned has given no weight to this portion of Dr. DeBattista's opinion, as it is inconsistent with the claimant's request to return to work, his positive response to medication, and his inconsistent complaints regarding mental health symptoms. Additionally, this portion of Dr. DeBattista's opinion is inconsistent with the largely benign mental status examination that he administered. Dr. DeBattista also opined that the claimant has a moderate limitation to his ability to relate and interact with coworkers and the public; maintain concentration, persistence and pace; associate with day-to-day work activity, including attendance and safety; accept instructions from supervisors; and maintain regular attendance in the work place and perform work activities on

a consistent basis. The undersigned has given some weight to this portion of Dr. DeBattista's opinion, as it is consistent with the claimant's inconsistent mental health complaints and his positive response to medication. Accordingly, the undersigned has reduced the claimant's residual functional capacity by limiting the claimant's interaction and performance of complex or detailed job instructions or decisionmaking.

AR 26 (citations to record omitted).

### 3. <u>**Evaluation of Medical Evidence**</u>

The opinions of treating physicians, examining physicians, and non-examining physicians are entitled to varying weight in disability determinations. *Lester*, 81 F.3d at 830. Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual. *Id.*; *Smolen*, 80 F.3d at 1285. The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a non-examining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990). An ALJ may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons. *Lester*, 81 F.3d at 831. In contrast, a contradicted opinion of a treating professional may be rejected for "specific and legitimate" reasons. *Id.* at 830. However, the opinions of a treating or examining physician are "not necessarily conclusive as to either the physical condition or the ultimate issue of disability." *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999).

The opinion of a non-examining physician may constitute substantial evidence when it is "consistent with independent clinical findings or other evidence in the record." *Thomas*, 278 F.3d at 957. Such independent reasons may include laboratory test results or contrary reports from examining physicians and Plaintiff's testimony when it conflicts with the treating physician's opinion. *Lester*, 81 F.3d at 831 (citing *Magallanes*, 881 F.2d at 755).

Plaintiff contends that the ALJ erred in rejecting Dr. DeBattista's opinion that Plaintiff was limited to jobs with one- or two-step instructions. Doc. 15 at 21. The ALJ rejected this portion of the doctor's opinion as inconsistent with Plaintiff's request to return to work, his positive response to medication, and his inconsistent complaints about his mental health symptoms. AR 26. Plaintiff contends that the ALJ failed to support his reasoning with specific

1  and legitimate evidence, but when the record is read as a whole, ample supporting findings are set

2  forth in the ALJ's summary of Plaintiff's treatment records at AR 21-26.

3      "[A]n ALJ is responsible for determining credibility and resolving conflicts in medical

4  testimony." *Magallanes*, 881 F.2d at 750.  An ALJ may choose to give more weight to opinions

5  that are more consistent with the evidence in the record.  20 C.F.R. §§ 404.1527(c)(4),

6  416.927(c)(4) ("the more consistent an opinion is with the record as a whole, the more weight we

7  will give to that opinion").  The Court is not required to accept Plaintiff's characterization of the

8  medical records and opinions.  Even if this Court were to accept that the record could support

9  Plaintiff's opinion, the record amply supports the ALJ's interpretation as well.  When the

10  evidence could arguable support two interpretations, the Court may not substitute its judgment for

11  that of the Commissioner.  *Jamerson*, 112 F.3d at 1066.

12      **D.    Summary**

13      The ALJ's determination of Plaintiff's mental residual functional capacity was legally

14  appropriate and supported by substantial evidence.  However, the record did not support the

15  determination of physical residual functional capacity, which was based on the ALJ's

16  unsupported conclusions concerning the June 2014 magnetic resonance images.

17      **IX.    Application of Medical-Vocational Guidelines**

18      Plaintiff contends that because of Plaintiff's combination of exertional and nonexertional

19  limitations, the ALJ erred in relying on the medical-vocation guidelines (the "grids") without the

20  benefit of vocational expert testimony.  The Commissioner disagrees.

21      Vocational expert testimony, even when a claimant claims both exertional and

22  nonexertional limitations, is not necessarily required.  A vocational expert is required only when

23  there are significant and sufficiently severe non-exertional limitations that are not accounted for

24  in the girds (see, Hoopai v. Astrue, 499 F. 3d 1071, 1076 (9th Cir. 2007).   However in the case at

25  bar,  because of the ALJ's error in determining Plaintiff's physical residual functional capacity,

26  the Court does not need to analyze this issue further.

27      When a claimant has a nonexertional limitation or restriction imposed by a medically

28  determinable impairment, the grids do not mandate a determination that the claimant is disabled

or not disabled. SSR 83-14, 1983 WL 31254 at *1 (1983). Instead, the ALJ in such a case must use the grids as a framework along with the regulations to determine disability. *Id.* Nonexertional impairments include environmental, postural and mental limitations. *Id.* at *1-2. After the ALJ has determined that the claimant can meet the primary strength requirements of sedentary, light or medium work, the ALJ must determine how much of the potential occupational base remains after disregarding the jobs that are unsuitable based on the claimant's nonexertional limitations. *Id.* at *2. When application of the strength requirements of the grids indicates that the claimant is disabled, the ALJ need not address the nonexertional requirements since these add nothing further to the determination. *Id.* at *3.

Use of a vocation resource, such as the publications set forth in 20 C.F.R. §§ 404.1566 and 416.966, may be useful in simple cases and necessary in more complex cases. *Id.* at *4. In addition, vocational expert testimony may "be helpful" in more complex cases. *Id.* SSR 83-14 sets forth specific examples concerning the determining the extent of remaining occupational base for various combinations of exertional and nonexertional limitations. *Id.* at 4-6. Because the Court remands this case for further evaluation of Plaintiff's exertional limitations, the Court need not review these examples in detail.

The testimony of a vocational expert is not required simply because a claimant has nonexertional limitations or requirements. *Razey v. Heckler*, 785 F.2d 1426, 1430 (9th Cir. 1986). "[A] vocational expert is required only when there are significant and 'sufficiently severe' non-exertional limitations not accounted for in the grid." *Hoopai v. Astrue*, 499 F.3d 1071, 1076 (9th Cir. 2007). For example, an ALJ does not err in determining that a claimant with depression adequately addressed with limited treatment was not sufficiently severe to render a decision at step five without vocational expert testimony. *Id.* at 1076-77.

### X.    Remand for Further Proceedings

When the Commissioner's decision is not supported by substantial evidence, as is the determination of Plaintiff's physical residual functional capacity here, the Court has the authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); *McCartey v. Massanari*, 298 F.3d 1072, 1076 (9th Cir. 2002).

"Generally when a court . . .reverses an administrative determination, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.'" *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004); *Moisa v. Barnhart*, 367 F.3d 882, 886 (9th Cir. 2004).  Here, remand is appropriate so that the Commissioner may secure expert medical opinions about whether Plaintiff's condition has worsened since the agency physicians issued their opinions and if so, secure supplemental expert analysis and opinion about Plaintiff's physical residual functional capacity.  If the Commissioner revises Plaintiff's residual functional capacity, she will also need to address Plaintiff's ability to perform work at step five.

## XI.     Conclusion and Order

It is hereby ordered that this case be REVERSED and REMANDED to the Commissioner, pursuant to sentence four of 42 U.S.C. § 405(g), for further proceedings in accordance with this opinion. The Clerk of Court is directed to enter judgment in favor of Plaintiff, Preston Scott Plaugher, and against Defendant, Nancy A. Berryhill, Acting Commissioner of Social Security.

IT IS SO ORDERED.

Dated:   **March 22, 2019**                    **/s/ Gary S. Austin**
                                                           UNITED STATES MAGISTRATE JUDGE